Evan J. Smith
BRODSKY & SMITH, LLC
240 Mineola Boulevard
First Floor
Mineola, NY 11501
Telephone:    516.741.4977
Facsimile:    516.741.0626
esmith@brodskysmith.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATISH SHINDE,<br><br>                              Plaintiff,<br><br>            v.<br><br>NET ELEMENT, INC., OLEG FIRER,<br>HOWARD ASH, JON NAJARIAN,<br>TODD RAARUP, MULLEN<br>TECHNOLOGIES, INC. and MULLEN<br>ACQUISITION, INC.<br><br>                              Defendants. | Case No.:<br><br>COMPLAINT FOR:<br><br>(1)   Breach of Fiduciary Duties<br>(2)   Aiding and Abetting Breach of Fiduciary<br>Duties<br>(3)   Violation of § 14(a) of the Securities<br>Exchange Act of 1934<br>(4)   Violation of § 20(a) of the Securities<br>Exchange Act of 1934<br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff, Atish Shinde ("Plaintiff"), by and through his attorneys, alleges upon information

and belief, except for those allegations that pertain to him, which are alleged upon personal

knowledge, as follows:

## SUMMARY OF THE ACTION

1.        Plaintiff brings this stockholder action against Net Element, Inc. ("Net Element" or

the "Company"), against Net Element, the Company's Board of Directors (the "Board" or the

"Individual Defendants,"), Mullen Technologies, Inc. ("Parent"), and Mullen Acquisition, Inc. ("Merger Sub," collectively with Parent, "Mullen," and Mullen, collectively with Net Element and the Individual Defendants, the "Defendants") for violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and for breaches of fiduciary duty as a result of Defendants' efforts to sell the Company to Parent as a result of an unfair process for an unfair price, and to enjoin an upcoming proposed stock-for-stock reverse merger which, when completed, will substantially dilute existing shareholders of Net Element, including Plaintiff, who will collectively own approximately only 15% of the combined company with the merger transaction valued at approximately $135 million (the "Proposed Transaction").

2.      The terms of the Proposed Transaction were memorialized in an August 5, 2020, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger, and later amended twice, on December 29, 2020 and thereafter on May 7, 2021  (the "Merger Agreement").  Under the terms of the Merger Agreement, Mullen will become an indirect wholly-owned subsidiary of Net Element, forming one publicly traded entity combined with the investors in Mullen, significantly diluting Net Element investors' share of the combined company.

3.      However, despite this description, it is in fact impossible to glean from the any publicly released documentation related to the Proposed Transaction, an estimate of the value, in U.S. Dollars, of the consideration that Plaintiff in his capacity as a stockholder of Net Element is set to receive.

4.      Thereafter, on May 14, 2021, Net Element filed a Registration Statement on Form S-4 (the "Registration Statement") with the SEC in support of the Proposed Transaction.

5.      Plaintiff alleges that the Individual Defendants (defined herein) have breached their fiduciary duties by agreeing to the Proposed Transaction based on a flawed process which will result in inadequate compensation for Plaintiff.

6.      The Proposed Transaction is unfair and undervalued for a number of other reasons. Significantly, the Registration Statement describes an insufficient process in which the Board rushed through an inadequate "sales process" as evidence by Mullen's continued inability to consummate the Proposed Transaction for more than nine months, requiring the Company to further engage its Financial Advisor, Alexander Capital LP ("Alexander Capital") to draft a second fairness opinion, likely at significant cost.

7.      In approving the Proposed Transaction, the Individual Defendants have breached their fiduciary duties of loyalty, good faith, due care and disclosure by, *inter alia*, (i) agreeing to sell Net Element without first taking steps to ensure that Plaintiff in his capacity as a Company public stockholder would obtain adequate, fair and maximum consideration under the circumstances; and (ii) engineering the Proposed Transaction to benefit themselves and/or Mullen without regard for Net Element's public stockholders such as Plaintiff.  Accordingly, this action seeks to enjoin the Proposed Transaction and compel the Individual Defendants to properly exercise their fiduciary duties to Plaintiff.

8.      Next, it appears as though the Board has entered into the Proposed Transaction to procure for itself and senior management of the Company significant and immediate benefits with no thought to Plaintiff, as well as the Company's public stockholders.  For instance, pursuant to the terms of the Merger Agreement, upon the consummation of the Proposed Transaction, Company Board Members and executive officers will be able to exchange all Company equity awards for the merger consideration.

9.      In violation of the Exchange Act and in violation of their fiduciary duties, Defendants caused to be filed the materially deficient Registration Statement on May 14, 2021 with the SEC.  The Registration Statement is materially deficient, deprives Plaintiff of the information necessary to make an intelligent, informed and rational decision of whether to seek appraisal of his shares rather than accept the consideration proffered in the Proposed Transaction, and is thus in breach of Defendants fiduciary duties and the Exchange Act.  As detailed below, the Registration Statement omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial projections for Net Element and Mullen, provided by Net Element and Mullen to the Company's financial advisor Alexander Capital and Mullen's financial advisor Raymond James & Associates ("Raymond James"); and (c) the data and inputs underlying the financial valuation analyses, if any, that purport to support the fairness opinions created by Alexander Capital and/or Raymond James and provide to the Company and the Board

10.     Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff.  This action seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the breaches of fiduciary duties by Defendants.

## PARTIES

11.     Plaintiff is a citizen of Massachusetts and, at all times relevant hereto, has been a Net Element stockholder.

12.     Defendant Net Element operates as a financial technology and value-added solutions company in North America, Russia, and the Commonwealth of Independent States.  Net Element is organized under the laws of Delaware and has its principal place of business at 3363

NE 163rd Street, Suite705, North Miami Beach, FL. Shares of Net Element common stock are traded on the New York Stock Exchange under the symbol "NETE."

13.     Defendant Oleg Firer ("Firer") has been a Director of the Company at all relevant times.  In addition, Firer serves as the Chairman of the Company Board and is the Company's Chief Executive Officer ("CEO").

14.     Defendant Howard Ash ("Ash") is a former director of the Company who served in that role during the sales process.

15.     Defendant Jon Najarian ("Najarian") has been a director of the Company at all relevant times.

16.     Defendant Todd Raarup ("Raarup") has been a director of the Company at all relevant times.

17.     Defendants identified in ¶¶ 13 - 16 are collectively referred to as the "Individual Defendants."

18.     Defendant Parent is a Southern California based licensed electric vehicle manufacturer with international distribution which owns several synergistic businesses including: CarHub, a new and unique digital platform that leverages AI and offers a complete, fun to use solution for buying, selling and owning a car.

19.     Defendant Merger Sub is a subsidiary of Parent created to effectuate the Proposed Transaction.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and Section 20(a) of the Exchange Act.  This action is not a collusive

one to confer jurisdiction on a court of the United States, which it would not otherwise have.  The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

21.     Personal jurisdiction exists over each defendant either because the defendants conduct business in or maintain operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District; for example, the Company's stock trades on the New York Stock Exchange which is headquartered in this District.

### THE INDIVIDUAL DEFENDANTS' FIDUCAIRY DUTIES

23.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Net Element and owe the Company the duties of due care, loyalty, and good faith.

24.     By virtue of their positions as directors and/or officers of Net Element, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Net Element to engage in the practices complained of herein.

25.     Each of the Individual Defendants are required to act with due care, loyalty, good faith and in the best interests of the Company.  To diligently comply with these duties, directors of a corporation must:

       a.  act with the requisite diligence and due care that is reasonable under the

circumstances;

b.  act in the best interest of the Company;

c.  use reasonable means to obtain material information relating to a given action or decision;

d.  refrain from acts involving conflicts of interest between the fulfillment of their roles in the Company and the fulfillment of any other roles or their personal affairs;

e.  avoid competing against the company or exploiting any business opportunities of the company for their own benefit, or the benefit of others; and

f.  disclose to the Company all information and documents relating to the company's affairs that they received by virtue of their positions in the Company.

26.    In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Net Element, are obligated to refrain from:

a.    participating in any transaction where the directors' or officers' loyalties are divided;

b.    participating in any transaction where the directors or officers are entitled to receive personal financial benefit not equally shared by the Company or its public stockholders; and/or

c.    unjustly enriching themselves at the expense or to the detriment of the Company or its stockholders.

27.    Plaintiff alleges herein that the Individual Defendants, separately and together, in

connection with the Proposed Transaction, violated, and are violating, the fiduciary duties they owe to Net Element, Plaintiff and the other public stockholders of Net Element, including their duties of loyalty, good faith, and due care.

28.     As a result of the Individual Defendants' divided loyalties, Plaintiff will not receive adequate, fair or maximum value for his Net Element common stock in the Proposed Transaction

## SUBSTANTIVE ALLEGATIONS

*Company Background*

29.     Net Element, operates as a financial technology and value-added solutions company in North America, Russia, and the Commonwealth of Independent States. It operates in two segments, North American Transaction Solutions and International Transaction Solutions. The Company offers a range of payment acceptance and transaction processing services that enable merchants of various sizes to accept and process approximately 100 payment options, including credit, debit, prepaid, and alternative payments; and value-added services and technologies, such as integrated payment technologies, point-of-sale solutions (POS), fraud management solutions, information solutions, and analytical tools.  The Company offers its services through retail and mobile merchants, as well as online.

30.     The Company's most recent financial performance press release before the announcement of the Proposed Transaction indicated sustained and solid financial performance. For example, in a June 3, 2020 press release announcing its 2020 Q1 financial results, the Company highlighted such milestones as growing revenues 5.3% in Q1 to $15.8 million compared with $15.0 million in Q1 2019.

31.     Speaking on these positive results, Net Element CEO Firer stated, "North American Transactions Solutions continued showing modest growth during the first quarter while our

International Transactions Solutions segment showed a slight increase in operating margins. Due to the COVID-19 pandemic's impact on the overall economy and in anticipation of lower processing volumes, we implemented company-wide cost savings by reducing executive pay and creating efficiencies in our work force to be better positioned for the months ahead."

32. Mullen Technologies is a Southern California-based licensed vehicle manufacturer that operates in various verticals of the businesses focusing in the automotive industry: Mullen Automotive, Mullen Energy, Mullen Auto Sales, Mullen Funding Corp., and CarHub. Mullen's marquee car, the Dragonfly K50, set to release in the U.S. in 2021 has received praise across the vehicle industry, as expressed in an April 2019 MotorTrend article, "What would you expect to pay for an all-electric, two-motor, all-wheel-drive, two-seat, carbon-fiber-bodied sports car that's roughly the size and shape of a Rimac C_Two? Before you answer, be aware that the 78-kW-hr battery is good for some 200-plus miles, and the doors merely pivot out sideways—there's no scissoring, butterflying, or scarab-winging drama to draw smartphone camera fire. $200 grand? $300 grand? Well, have we got a deal for you! This little gem right here, assembled in California, could be yours as soon as next summer for just $125,000."

33. Speaking on the strong future prospects for Mullen and its industry, the Press Release regarding the Proposed Transaction stated, "the global EV market in 2019 was $162.3 billion and is on pace to reach $716.8 billion by 2027, driven by favorable government policies and subsidies, calls to reduce vehicle emissions, consumer demand and other factors."

34. Mullen's strategic plans and market share opportunities indicate a future of financial success. This will come at the expense of the minority Net Element shareholders who will be significantly diluted, retaining only approximately 15% of the pro forma ownership of the

combined company while Mullen investors retain an 85% stake in the combined company, according to the August 5 Press Release for the Proposed Transaction.

35.     Despite this solid performance and potential, the Individual Defendants have caused Net Element to enter into the Proposed Transaction for insufficient consideration.

***The Flawed Sales Process***

36.     As detailed in the Registration Statement, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants, and was designed with only one concern in mind – to effectuate a sale of the Company to Mullen.

37.     Notably, the Company failed to conduct a sufficient market check for potentially interested third parties.  In fact, the Registration Statement does not indicate if any such market check was performed by the Company or by anyone on its behalf at any point throughout the sales process.

38.     Furthermore it appears that the Company's financial advisor, Alexander Capital, was engaged only after the proposed transaction was presented to the Board, so that it could render an opinion on such.  The Registration Statement is unclear if Alexander Capital actually had any role whatsoever in advising the Company or Board prior to the negotiations with Mullen being, for all intents and purposes, finished.

39.     Such a hasty and ill-thought out process is evident in the fact that the consummation of the Proposed Transaction has been delayed for approximately nine months as Mullen struggles to meet all necessary prerequisites in order to execute the Proposed Transaction.  Such delays has caused the Company to further engage Alexander Capital to provide an amended fairness opinion.

40.     Notably the Registration Statement fails to provide the specific differences between the original and amended fairness opinions provided by Alexander Capital, nor does the Registration Statement provide the amount of compensation to be provided to Alexander Capital for its services as financial advisor, nor does it provide information related to what the additional cost of the amended fairness opinions was.

41.     Next, while the Registration Statement indicates that a "special committee" of independent directors was created to review the May 7, 2021 amended merger agreement, the Registration Statement fails to indicate why such a decision was not made until after the sales process was, in essence, over.  The Registration Statement also does not adequately describe the powers this "special committee" held.

42.     In addition, the Registration Statement is also unclear as to the existence or nature of any non-disclosure agreement entered into between Net Element and any potentially interested third party, including Mullen, as part of the sales process, and if the terms of any such agreements differed from one another, including any "don't-ask, don't-waive" provisions or standstill provisions, and if so, the specific differences therein including differences in the conditions, if any, under which such provisions would fall away.

43.     It is not surprising, given this background to the overall sales process, that it was conducted in a completely inappropriate and misleading manner.

***The Proposed Transaction***

44.     On August 5, 2020, Net Element issued a press release announcing the Proposed Transaction.  The press release stated, in relevant part:

> **MIAMI, Aug. 05, 2020 (GLOBE NEWSWIRE) --** via NetworkWire -- Net Element, Inc. (NASDAQ: NETE) ("Net Element" or the "Company") today announced the execution of a definitive agreement to merge with privately-held

Mullen Technologies, Inc. ("Mullen"), a Southern California-based electric vehicle company, in a stock-for-stock reverse merger in which Mullen's stockholders will receive a majority of the outstanding stock in the post-merger Company.

**Highlighted Terms of the Definitive Merger Agreement:**

Under the terms of the agreement, Net Element's wholly owned, newly formed subsidiary will acquire all the outstanding shares of Mullen.  Upon completion of the merger, Net Element shareholders will own 15% and Mullen shareholders will own 85% of the issued and outstanding shares of the combined Company.  Net Element has the right to acquire up to an additional 6.7% of the combined Company depending on the amount of loans from Net Element to Mullen prior to closing. Immediately prior to completion of the merger, Net Element will, subject to Net Element's stockholders' approval, divest itself of its payments-processing business and portfolio.  The completion of the merger is subject to shareholder and NASDAQ approval, as well as other conditions referenced in the merger agreement.  Upon closing of the merger, Net Element's current management team and board of directors will resign and be replaced by a management team led by David Michery, Mullen's founder, chairman and chief executive officer and the Mullen-nominated board of directors.  The Company has obtained a fairness opinion satisfactory to its board of directors, and each company's board of directors has approved the execution of the merger agreement.  Mullen's shareholders have approved the execution of the merger agreement and the transactions contemplated in such agreement.

"Our team at Mullen Technologies is very proud to take the next step in completing this acquisition of Net Element," stated David Michery, CEO and Founder of Mullen Technologies, Inc.  "Mullen is dedicated to the development of environmentally friendly, affordable technology that will bring energy solutions to consumer products and communities in the near future.  This acquisition provides the resources that Mullen can utilize to execute on its business model to integrate state-of-the-art, clean-battery technology into personal and commercial vehicles, and eventually sustainable, reusable battery technology into everyday consumer products."

Founded in 2014, Mullen, through ICI (Independent Commercial Importers), expects to launch the Dragonfly K50, a luxury sports car, in the first half of 2021.  Mullen currently operates seven retail locations throughout California, as well as one in Arizona.  Several national and local events, from the Los Angeles Auto Show to the New York International Auto Show, have showcased Mullen automobiles and concept cars.  Mullen's Dragonfly K50 won the Governor's Choice Award at the 2019 Balboa Bay Club's Classic Auto Show.

"We are excited to move forward with the proposed merger with Mullen Technologies. We are confident that this transaction will increase shareholder

value in the long term," commented Oleg Firer, executive chairman of Net Element.

***The Inadequate Merger Consideration***

45.     As set forth above, the Proposed Transaction significantly undervalues the stockholders of the Company by diluting their future interest in the surviving company.

46.     First, it is impossible to glean from the Registration Statement, Merger Agreement, Merger Announcement, or any other documentation related to the Proposed Transaction, the actual value of the consideration that Plaintiff or other public stockholders of Net Element will receive. Notably, it appears that, given the structure of the Merger Agreement, Plaintiff and other stockholders of the Company are simply seeing their interest diluted significantly as the Company stockholders are receiving stock amounting to only 15% of Mullen, a private entity with no valuation data available or provided

47.     The proposed valuation does not adequately reflect the intrinsic value of the Company.  Moreover, the valuation does not adequately take into consideration how the Company is performing, considering key financial improvements.

48.     For example, according to a Marketing Sentinel article from July 13, 2020, financial analysts have valued the Company's stock as high as $25.00 per share within the past year.  Such a value is substantially more than the consideration contained in the Proposed Transaction.

49.     In 2017 and 2018, the Company was ranked by Deloitte as "one of North America's 500 fastest growing technology, media, telecommunications, life sciences and energy tech companies, NETE credits its progression to organic growth in its North America transactions segment" as according to a August 12, 2020 Press Release regarding the Proposed Transaction.

50.     According to a FormaCar article from June 18, 2020, Mullen has shown potential of becoming a genuine competitor to Tesla, "The sports car takes advantage of an aluminum space-

frame build and carbon-fiber bodywork. Its two electric motors mounted one per axle churn out

435 hp (324 kW) and 680 Nm (500 lb-ft) total, taking the coupe to 96 km/h (0-60 mph) in 4.7

seconds. The speed cap lies at 200 km/h (124 mph), and the traction battery stores up to 78.84

kilowatt-hours of energy, which yields around 380 km (236 miles) of NEDC-rated range. To put

things into perspective, the Tesla Model 3 Long Range does the sprint in 4.6 seconds, maxes out

at 233 km/h (145 mph), and has at least 518 km (322 miles) of range according to the EPA test

protocol. Tested against the more common WLTP standard, it gets 560 km (348 miles) of range…

Later on, the company plans to unveil a new SUV called MX-05 and a mysterious innovative

"super battery."

51.     Mullen has expressed its confidence in the merger and its vision for the Company

in the August 12, 2020 Press Release referenced above, "While still in its planning stages, the new

EV manufacturing facility will comprise 1.3 million square feet of assembly and manufacturing

space. A total of nearly 4000 jobs are expected to be created that include 55 at startup, 863 by

2026, and an additional 3,000 from the research and development of lithium-ion batteries through

Mullen's subsidiary company, Mullen Energy. 'We believe the timing of this merger is ideal for

Mullen Technologies,' Mullen CEO David Michery said in recent statements 'It comes on the

preparation of our launch of the Dragonfly K50, which will be available in (the second quarter) of

2021 through our retail network in California and Arizona, and the development of a new EV

model, the MX-05 Sport Utility Vehicle.'"

52.     Regarding the larger industry, the article notes, "Electric vehicle sales have grown

substantially in recent years due to the falling prices of EV batteries, changes in fuel regulations

and electric vehicle mandates in countries like China, which is expected to account for almost half

(48%) of all passenger car sales in 2025, according to research by BloombergNEF. Besides taking

over most of the global passenger market by 2040, the report also predicts that electric vehicles will dominate municipal bus sales by 81% while taking 56% of light commercial vehicle sales and 31% of the medium commercial market."

53.     Clearly, while the deal will be beneficial to the it comes at great expense to Plaintiff and other public stockholders of the Company, whose investment in the promising and successful company will be highly diluted.

54.     It is clear from these statements and the facts set forth herein that this deal is designed to maximize benefits for Mullen at the expense of Net Element public stockholders, which clearly indicates that Net Element stockholders were not an overriding concern in the formation of the Proposed Transaction.

***Preclusive Deal Mechanisms***

55.     The Merger Agreement contains certain provisions that unduly benefit the Mullen by making an alternative transaction either prohibitively expensive or otherwise impossible. Notably, in the event of termination, the merger agreement requires Net Element to pay up to $750,000 to the Mullen and/or its affiliates, if the Merger Agreement is terminated under certain circumstances.  Moreover, under one circumstance, Net Element must pay this termination fee even if it consummates any competing Superior Proposal (as defined in the Merger Agreement) *within 12 months following the termination* of the Merger Agreement.  The termination fee, or Break-Up Fee (as defined in the Merger Agreement), will make the Company that much more expensive to acquire for potential purchasers.  The Break-Up Fee in combination with other preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

56.     The Merger Agreement also contains a "Competing Transactions and Superior Proposals." provision that restricts Net Element from considering alternative acquisition proposals

by, *inter alia*, constraining Net Element's ability to solicit or communicate with potential acquirers or consider their proposals. Specifically, the provision prohibits the Company from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider an unsolicited bona fide *"Competing Transaction"* if it constitutes or is reasonably calculated to lead to a "*Superior Proposal*" as defined in the Merger Agreement.

57.     Moreover, the Merger Agreement further reduces the possibility of a topping offer from an unsolicited purchaser. Here, the Individual Defendants agreed to provide to the Mullen and/or its affiliates information in order to match any other offer, thus providing the Mullen access to the unsolicited bidder's financial information and giving Parent the ability to top the superior offer. Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of the Mullen.

58.     These provisions, individually and collectively, materially and improperly impede the Board's ability to fulfill its fiduciary duties with respect to fully and fairly investigating and pursuing other reasonable and more valuable proposals and alternatives in the best interests of the Company and its public stockholders.

59.     Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Transaction.

***Potential Conflicts of Interest***

60.     The breakdown of the benefits of the deal indicates that Net Element insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders such as Plaintiff. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff as a public stockholder of Net Element.

61.     Notably, Company insiders, currently own large, illiquid portions of Company stock that will be exchanged for the merger consideration upon the consummation of the Proposed Transaction, as indicated below. However, the Registration Statement fails to provide an accounting of the merger consideration they will be exchanged for upon the consummation of the Proposed Transaction.

| Name and address of beneficial owner | Amount and nature of beneficial ownership (number of shares of Common Stock beneficially owned) | Percent of class (1) |
|---|---|---|
| Oleg Firer | 552,249 (2) | 10.60% |
| Steven Wolberg | 180,287 (3) | 3.39% |
| Jeffrey Ginsberg | 28,179 | 0.54% |
| Jon Najarian | 18,835 | 0.36% |
| John Roland | 1,029 | 0.02% |
| Todd Raarup | 1,029 | 0.02% |
| Esousa Holdings LLC 211 East 43rd Street, Suite 402 New York, NY 10017 | (4) | (4) |
| All directors and executive officers as a group (6 persons) | 781,608 | 14.94% |

62.     Moreover, upon the consummation of the Proposed Transaction, the Registration Statement indicates that each outstanding Company stock option, restricted share, or other equity award will be canceled and converted into the right to receive certain consideration, however the Registration Statement does not provide adequate information regarding the preceding.

63.     In addition, certain employment agreements with certain Net Element executives, entitle such executives to severance packages should their employment be terminated under certain circumstances.  These 'golden parachute' packages are significant, and will grant each director or officer entitled to them millions of dollars, compensation not shared by Plaintiff and will be paid out as follows:

**Golden Parachute Compensation**

| Name | Cash ($) | Equity ($) | Pension/NQDC ($) | Perquisites/benefits ($) | Tax reimbursement ($) | Other ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Steven Wolberg | 625,000(1) | — | — | 24,000(2) | — | — | 649, |

64.     The Registration Statement also fails to adequately disclose communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for Plaintiff to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

65.     Thus, while the Proposed Transaction is not in the best interests of Net Element, Plaintiff or Company stockholders, it will produce lucrative benefits for the Company's officers and directors.

***The Materially Misleading and/or Incomplete Registration Statement***

66.     On May 14, 2021, Net Element caused to be filed with the SEC a materially misleading and incomplete Registration Statement that, in violation of the Exchange act and their fiduciary duties, failed to provide Plaintiff in his capacity as a Company stockholder with material information and/or provides materially misleading information critical to the total mix of information available to Plaintiff concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

67.     Specifically, the Registration Statement fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the Registration Statement fails to disclose

   a.  A dollar value, precise or approximate, of the merger consideration being offered to Net Element stockholders as part of the Proposed Transaction;

   b.  The specific reasoning as to why no market check for potentially interested third parties was conducted by the Board or anyone on its behalf throughout the sales process;

   c.  The specific reasoning for Alexander Capital's engagement so late in the sales process;

   d.  The specific reasoning as to why the Special Committee of the Board was not created until after the entry into the Proposed Transaction;

   e.  The specific powers of the Special Committee;

   f.  Whether the confidentiality agreements entered into by the Company with Mullen differed from any other unnamed confidentiality agreement entered into between the Company and potentially interested third parties, and if so, in what way;

   g.  All specific conditions under which any standstill provision contained in any entered confidentiality agreement entered into between the Company and potentially interested third parties throughout the sales process, including Mullen, if any such exists, would fall away; and

19

h. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of Plaintiff and Company stockholders.

*Omissions and/or Material Misrepresentations Concerning Net Element's Financial Projections*

68.     The Registration Statement fails to provide material information concerning financial projections provided by Net Element management and relied upon by Alexander Capital in its analyses.  The Registration Statement discloses management-prepared financial projections for the Company which are materially misleading.

69.     Notably the Registration Statement indicates that in creating its fairness opinion, Alexander Capital reviewed, "internal financial analyses and forecasts prepared by (i) the management of Mullen relating to its business and (ii) the management of Net Element relating to the respective business of Net Element and Mullen".

70.     As such, the Registration Statement should have, but fails to provide, certain information in the projections that Net Element management provided to the Board and Alexander Capital.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the

company's prospects." *In re Netsmart Techs., Inc. S'holders Litig*., 924 A.2d 171, 201-203 (Del. Ch. 2007)

71.     Notably, the Registration Statement provides no projection information whatsoever, making it impossible for Plaintiff to determine the value of his shares of Net Element going forward or to make an informed decision on whether to vote for the Proposed Transaction.

72.     This information is necessary to provide Plaintiff in his capacity as a Company stockholder a complete and accurate picture of the sales process and its fairness.  Without this information, Plaintiff is not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

73.     Without accurate projection data presented in the Registration Statement, Plaintiff is unable to properly evaluate the Company's true worth, the accuracy of Alexander Capital's financial analyses, or make an informed decision whether to vote in favor of the Proposed Transaction.  As such, the Board has breached their fiduciary duties by failing to include such information in the Registration Statement.

*Omissions and/or Material Misrepresentations Concerning Mullen's Financial Projections*

74.     The Registration Statement fails to provide material information concerning financial projections provided by Mullen's management and relied upon by Alexander Capital in its analyses.  The Registration Statement discloses management-prepared financial projections for the Company which are materially misleading.

75.     Notably the Registration Statement indicates that in creating its fairness opinion, Alexander Capital reviewed, "internal financial analyses and forecasts prepared by (i) the

management of Mullen relating to its business and (ii) the management of Net Element relating to the respective business of Net Element and Mullen".

76.     As such, the Registration Statement should have, but fails to provide, certain information in the projections that Mullen's management provided to the Board and Alexander Capital.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects."  *In re Netsmart Techs., Inc. S'holders Litig*., 924 A.2d 171, 201-203 (Del. Ch. 2007)

77.     Notably, the Registration Statement provides no projection information whatsoever, making it impossible for Plaintiff to determine the value of Mullen or the merger consideration.

78.     This information is necessary to provide Plaintiff in his capacity as a Company stockholder a complete and accurate picture of the sales process and its fairness.  Without this information, Plaintiff is not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

79.     Without accurate projection data presented in the Registration Statement, Plaintiff is unable to properly evaluate the Mullen's true worth, the accuracy of Alexander Capital's financial analyses, or make an informed decision whether to vote in favor of the Proposed Transaction.  As such, the Board has breached their fiduciary duties by failing to include such information in the Registration Statement.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Alexander Capital*

80.     In the Registration Statement, Alexander Capital describes its fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

81.     With respect to the *Stock Performance Relative to Market* Analysis, the Registration Statement fails to provide the following:

   a.   All analyzed metrics for each specific comparable company analyzed.

82.     With respect to the *Discounted Cash Flow Analysis* for Mullen, the Registration Statement fails to provide the following:

   a.   The specific adjustments to the forecasts made by Alexander Capital to be more conservative in nature based on Alexander Capital's past experience with emerging and developing companies;

   b.   All forecasts used underlying this analysis, specifically referred to as the "Mullen forecast";

   c.   The specific inputs and assumptions used to determine the utilized discount rate range of 9.0% to 20.0%;

   d.   Mullen's weighted average cost of capital;

   e.   Mullen's unlevered free cash flow for years ending December 31, 2021 through 2030;

   f.   Mullen's range of terminal values;

g.  The specific inputs and assumptions used to determine the utilized perpetual growth rate range of 2.0% to 5.0%;

h.  The applicable tax rates for Mullen; and

i.  Mullen's beta.

83.  With respect to the *Precedent Transaction Analysis* for Mullen, the Registration Statement fails to provide the following:

a.  The date the transactions where consummated; and

b.  The specific reasoning each transaction analyzed was a SPAC.

84.  With respect to the *Public Comparable Analysis* for Mullen, the Registration Statement fails to provide the following:

a.  All analyzed metrics for each specific comparable company analyzed

85.  With respect to the *Present Value of Future Share Price Analysis* for Mullen, the Registration Statement fails to provide the following:

a.  All forecasts used underlying this analysis, specifically referred to as the "Mullen forecast";

b.  Mullen's EBITDA Multiples;

c.  Mullen's implied EV;

d.  The specific inputs and assumptions used to determine the utilized range of discount factors from 9.0% to 20.0%;

86.  The Registration Statement also does not adequately explain why no significant analyses were dedicated to the determination of Net Element's value.

87.  These disclosures are critical for Plaintiff to be able to make an informed decision on whether to vote in favor of the Proposed Transaction.

88.     Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the proposed consideration truly maximizes his value and serves his interest as a stockholder.  Moreover, without the key financial information and related disclosures, Plaintiff cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in his best interests as a public Net Element stockholder.  As such, the Board has breached their fiduciary duties by failing to include such information in the Registration Statement.

## FIRST COUNT

## Claim for Breach of Fiduciary Duties

## (Against the Individual Defendants)

89.     Plaintiff repeats all previous allegations as if set forth in full herein.

90.     The Individual Defendants have violated their fiduciary duties of care, loyalty and good faith owed to Plaintiff.

91.     By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff of the true value of his investment in Net Element.

92.     As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty and good faith owed to Plaintiff by entering into the Proposed Transaction through a flawed and unfair process and failing to meet their obligations to make complete and accurate disclosures regarding this process and the data and analyses underlying the Proposed Transaction.

93.     Indeed, the Individual Defendants breached their duty of due care and candor by failing to disclose to Plaintiff all material information necessary for him to make an informed decision on whether to tender his shares in favor of the Proposed Transaction.

94.     The Individual Defendants dominate and control the business and corporate affairs of Net Element, and are in possession of private corporate information concerning Net Element's assets, business and future prospects.  Thus, there exists an imbalance and disparity of knowledge and economic power between them and Plaintiff which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing stockholder value without the disclosure of all proper material information.

95.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff.

96.     As a result of the actions of the Individual Defendants, Plaintiff will suffer irreparable injury in that he has been and will be prevented from obtaining a fair price for his shares or from being able to make an informed decision with respect to the Proposed Transaction.

97.     Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff, all to the irreparable harm of the Plaintiff.

98.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

**SECOND COUNT**

**Aiding and Abetting the Board's Breaches of Fiduciary Duty**

**Against Defendant Net Element, Parent, and Merger Sub**

99.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

100.     Defendant Net Element, Parent, and Merger Sub knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Transaction, which, without such aid, would not have occurred.

101.     As a result of this conduct, Plaintiff has been and will be damaged in that he has been and will be prevented from obtaining a fair price for his shares or from being able to make an informed decision with respect to the Proposed Transaction.

102.     Plaintiff and the members of the Class have no adequate remedy at law.

**THIRD COUNT**

**Violations of Section 14(a) of the Exchange Act**

**(Against All Defendants)**

103.     Plaintiff repeats all previous allegations as if set forth in full herein.

104.     Defendants have disseminated the Registration Statement with the intention of soliciting Plaintiff to vote his shares in favor of the Proposed Transaction.

105.     Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction.  Specifically, Section 14(a) provides that:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities

exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

106.    As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

107.    The Registration Statement was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render them non-misleading

108.    The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

109.    The Individual Defendants were at least negligent in filing a Registration Statement that was materially misleading and/or omitted material facts necessary to make the Registration Statement not misleading.

110.    The misrepresentations and omissions in the Registration Statement are material to Plaintiff, and Plaintiff will be deprived of this entitlement to decide whether to vote his shares in favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

**FOURTH COUNT**

**Violations of Section 20(a) of the Exchange Act**

**(Against All Individual Defendants)**

111.    Plaintiff repeats all previous allegations as if set forth in full herein.

112.    The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the Registration Statement was materially misleading to Plaintiff.

113.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Registration Statement and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The

Individual Defendants were able to, and did, control the contents of the Registration Statement. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Registration Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

114. The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Net Element's business, the information contained in its filings with the SEC, and its public statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders, including Plaintiff, and that the Registration Statement was misleading. As a result, the Individual Defendants are responsible for the accuracy of the Registration Statement and are therefore responsible and liable for the misrepresentations contained herein.

115. The Individual Defendants acted as controlling persons of Net Element within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Net Element to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Net Element and all of its employees. As alleged above, Net Element is a primary violator of Section 14 of the Exchange Act and SEC Rule 14a-9. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in his favor, and against the Defendants, as follows:

A. Enjoining the Proposed Transaction;

B.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C.      Declaring and decreeing that the Merger Agreement was agreed to in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

D.      Directing the Individual Defendants to exercise their fiduciary duties to commence a sale process that is reasonably designed to secure the best possible consideration for Net Element and obtain a transaction which is in the best interests of Net Element and its stockholders, including Plaintiff;

E.      Directing defendants to account to Plaintiff sustained because of the wrongs complained of herein;

F.      Directing the Individual Defendants to exercise their fiduciary duties to disseminate a Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

G.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

H.      Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: May 28, 2021

**BRODSKY & SMITH, LLC**

By: _____

Evan J. Smith
240 Mineola Boulevard
Mineola, NY  11501
Phone:  (516) 741-4977
Facsimile (561) 741-0626

*Counsel for Plaintiff*